*Pro Se 1 2022*



FILED _____ LODGED
_____ RECEIVED
FEB 28 2023
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

Alain Hensley

        Plaintiff(s),

  v.

TD AMERITRADE, INC.
TD AMERITRADE, INC.,
WATERHOUSE SECURITIES, INC.,
TD WATERHOUSE INVESTOR
SERVICES, INC., TD WATERHOUSE
INVESTOR SERVICES, INC.

GTS EQUITY PARTNERS LLC
GTS EXECUTION SERVICES LLC
GTS SECURITIES LLC
GLOBAL TRADING SYSTEMS, GTS
SECURITIES LLC, GTS MISCHLER

CHARLES SCHWAB & CO., INC.
SCHWAB HOLDINGS, INC.

FINANICAL INDUSTRY
REGULATORY AUTHORITY
"FINRA"

And dose 1-100 Inclusive,
        Defendant(s)

CASE NO. 23cu 5159 DGE
[to be filled in by Clerk's Office]

COMPLAINT FOR A CIVIL CASE

Jury Trial: ☒ Yes  ☐ No

COMPLAINT FOR A CIVIL CASE - 1

*Pro Se 1 2022*

# THE PARTIES TO THIS COMPLAINT

A.    Plaintiff(s)

| | |
|---|---|
| Name | Alain Hensley |
| Street Address | 22 Lapsley Dr. |
| City and County | Dupont, Pierce |
| State and Zip Code | Washington 98327 |
| Telephone Number | (253) 431-3908 |

B.    Defendant(s)

Defendant No. 1

| | |
|---|---|
| Name | TD AMERITRADE, INC. WATERHOUSE SECURITIES, INC., TD WATERHOUSE INVESTOR SERVICES, INC., TD WATERHOUSE INVESTOR SERVICES, INC. |
| Job or Title *(if known)* | |
| Street Address | 200 SOUTH 108TH AVENUE |
| City and County | OMAHA |
| State and Zip Code | NE, 68154 |
| Telephone Number | 1-800-669-3900 |

Defendant No. 2

| | |
|---|---|
| Name | GTS SECURITIES LLC GLOBAL TRADING SYSTEMS, GTS SECURITIES LLC, GTS MISCHLER |
| Job or Title *(if known)* | |
| Street Address | 545 MADISON AVENUE   15th Floor |
| City and County | New York |
| State and Zip Code | New York, 10022 |
| Telephone Number | (212) 715-2830 |

COMPLAINT FOR A CIVIL CASE - 2

*Pro Se 1 2022*

Defendant No. 3

| | |
|---|---|
| Name | CHARLES SCHWAB & CO., INC., SCHWAB HOLDINGS, INC. |
| Job or Title *(if known)* | |
| Street Address | 211 MAIN STREET |
| City and County | SAN FRANCISCO |
| State and Zip Code | CA 94105 |
| Telephone Number | (415)-636-7000 |

Defendant No.4

| | |
|---|---|
| Name | FINANICAL INDUSTRY REGULATORY AUTHORITY "FINRA" |
| Job or Title *(if known)* | |
| Street Address | 1735 K Street, NW |
| City and County | |
| State and Zip Code | Washington, DC 20006 |
| Telephone Number | (202) 728-8000 |

The plaintiff Alain Hensley is a citizen of the county of Pierce within the State of Washington.

The Defendant(s) TD AMERITRADE, INC.  TD AMERITRADE, INC., WATERHOUSE SECURITIES, INC., TD WATERHOUSE INVESTOR SERVICES, INC., TD WATERHOUSE INVESTOR SERVICES, INC. is incorporated under the laws of the State of Delaware and has its principal place of business in the State of Nebraska.

GTS EQUITY PARTNERS LLC GTS EXECUTION SERVICES LLC GTS SECURITIES LLC, GLOBAL TRADING SYSTEMS, GTS SECURITIES LLC, GTS

*Pro Se 1 2022*

1   MISCHLER is incorporated under the laws of the State of Delaware,  and has its principal place
2   of business in the State of New York
3       CHARLES SCHWAB & CO., INC. SCHWAB HOLDINGS, INC. is incorporated under
4   the laws of the State of Delaware and has its principal place of business in the State of
5   California.
6       FINRA
7       AND DOSE 1-200, INCLUSIVE
8                           **Statement of Claim**
9       1. Plaintiff is a owner of Meta Materials shares ("MMAT") as well as the class A
10  preferred shares ("MMTLP"). The MMTLP shares were offered by TD Ameritrade Holding
11  Corporation, TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., TD Ameritrade Investment
12  Management, LLC, or any corporate parent, corporate subsidiary, or employee of the same and
13  The Charles Schwab Corporation or any corporate parent, corporate subsidiary, or employee of
14  the same in 2022 and prior.
15      2. Plaintiff is informed, believes, and thereon alleges that Defendants were negligent and
16  failed in their fiduciary duty to Plaintiff by failing to ensure that Defendant's securities were
17  genuine registered certificates. Plaintiff also alleges, along with other parties in the Financial
18  Industry, including on information and belief GTS and Market Makers who illegally created,
19  shorted, traded, synthetic, counterfeit, unregistered, and unauthorized share certificates as well as
20  fraudulently concealing the fact that they did not have the authentic, registered share certificates
21  in their possession, MetaMeterials, Inc. had been subjected to a corporate hijacking by fraudsters
22  with the assistance of The Defendants, and that Defendants knew that the fraud had
23  compromised the DTCC depository.
24

COMPLAINT FOR A CIVIL CASE - 4

*Pro Se 1 2022*

1   They are choosing to misrepresent it and cover this up, thereby intentionally harming the

2   interests of retail investors. Plaintiff asserts a variety of federal and state, civil, and criminal

3   claims and seeks prohibitive injunctive relief, monetary settlement, and punitive damages.

4   Plaintiff requests that the Court enjoin such unethical and illegal conduct.

5       3. On about June 28, 2021, Torchlight Energy Resources merged with and

6   became MetaMaterials ("MMAT"). MMAT is the maker of nanocomposite materials.

7   Subsequently, additional shares were issued as preferred MMTLP shares which eventually

8   brought us to Next Bridge Hydrocarbons ("NBH"). Without the entity's consent, Market Makers

9   traded MMTLP and flooded the marketplace with unlawful securities. Although the

10   Approximate sum of 165,000,000 shares were to be issued in MMTLP to go into NBH, in order

11   to maximize their profits, and with the assistance and consent of Defendants knowingly, with full

12   knowledge and contrary to the law, allowed Market Makers to sell and market false, nonexistent

13   and illegal shares to the public including Plaintiff herein. The illegal shares were utilized to

14   reduce the stock price of MMTLP On, to harm the interests of retail investors and Plaintiff, and

15   to create an environment where the stock market was not operating per law or fairly.

16       4. On information and belief, Defendants and market makers, always relevant herein,

17   acted with the intention to harm retail investors. Defendant has been doing business within

18   Pierce County since the issuance of the shares and until today. Plaintiff does not know the true

19   names, capacities, or basis for liability of Defendants sued herein as Does 1-200, inclusive, as

20   each fictitiously named Defendants is in some manner liable to Plaintiff. Plaintiff will amend this

21   Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and

22   believes, and thereon alleges, that at all relevant times mentioned in this Complaint, each of the

23   fictitiously named Defendants are responsible in some manner for the injuries and damages to

24

*Pro Se 1 2022*

1  Plaintiff so alleged and that such Defendants and each of them proximately caused such injuries

2  and damages.

3          5. Plaintiff is informed and believes, and thereon alleges, that always herein

4  mentioned, the Defendants was the agent, employee, servant, and joint venturer of, and in doing

5  the things alleged herein below, was acting within the course and scope of such agency,

6  employment, and joint venture. These processes required multiple parties to complete the

7  transaction since the Defendants were aware of and participated in each, directly or indirectly. At

8  all times relevant hereto, Defendant Had a fiduciary Responsibility and owed a duty of care and

9  good faith and fair dealing concerning any transaction entered into by the parties and

10  concerning all of the dealings between Plaintiff and Defendants as alleged herein into by the

11  parties and concerning all of the dealings between Plaintiff and Defendants as alleged herein.

12  Plaintiff is informed and believes, and thereon alleges, that Defendant herein is named in their

13  respective purported or putative capacities, based on Plaintiff's claims or assertions only, and are

14  not to be taken as judicial admissions by Plaintiff any fact or facts in dispute in this action.

15          6. In 2022, Plaintiff purchased shares of MMTLP offered through Defendants. Plaintiff

16  purchased the shares with the understanding provided by Defendants that Plaintiff could trade

17  the stock up until and thru December 12, 2022, or wait until MMTLP went private on or about

18  December 14, 2022, and receive Next Bridge Hydrocarbons ('NBH") shares. NBH is a private

19  company in the oil and gas business which, in essence, was a dividend received related to TRCH,

20  MMAT, and has substantial oil and gas assets of value. With regulators' consent, Defendants

21  represented, marketed, and expressly and implicitly stood behind the legitimacy of the MMTLP

22  shares they sold to Plaintiff (and Washington and National residents in total). Defendants, with

23  regulatory confirmation, accepted and acknowledged that MMTLP was to be traded through 12-

24  8-2022 with a commensurate right to obtain the right to either sell the MMTLP shares (by the

COMPLAINT FOR A CIVIL CASE - 6

*Pro Se 1 2022*

1    end of business 12-12-2022) or move those MMTLP shares following their cancellation into the

2    private oil and gas entity- NBH. If purchases of MMTLP occurred after 12-9-2022, It was

3    understood and represented that those shares would not be entitled to the NBH option but could

4    trade those shares up until the end of 12-13-2022.

5        7. On or about 11/08/2022, Plaintiff requested a Transfer of 74 shares of MMTLP to the

6    transfer agent. American Stock Transfer & Trust Company, LLC (AST), Defendant transferred

7    these shares after an exhausting process of multiple phone calls where Defendant repeatedly

8    provided incorrect and misleading information. Defendant misrepresented this process and

9    omitted factual information. Plaintiff finally concluded that Defendant was not going to provide

10   accurate information or assist in transferring the shares. Plaintiff resorted to calling AST and

11   then Calling Defendant. While Plaintiff placed AST on hold, Plaintiff merged the calls; at that

12   time, the agent from AST, a supervisor that has been employed with AST for 25 years, Listened

13   to the incorrect information being provided by Defendant. At this time, the AST agent advised

14   the Defendant on the correct and factual information. Defendant attempted to mislead Plaintiff

15   again; the Agent from AST informed Plaintiff to Repeat after me and then instructed him to

16   make an Automated Customer Account Transfer Service (ACATS) request and to have this

17   entered Manually. Defendant advised that it was being processed. The Plaintiff received an email

18   on 11/09/2022. On or about 11/14/2022, Plaintiff received a letter from AST confirming the

19   transfer had been Completed.

20       8. On or about 12/05/2022, Plaintiff contacted the Defendant to process another

21   transaction of MMTLP again to be transferred to AST. Defendant again offered a

22   misrepresentation of the process after Plaintiff explained the previous transfer process had gone

23   through and that the previously transferred shares were in his AST account. Defendant advised

24   that the last transfer had failed and was, in fact, a DRS transfer (direct Registration Service

*Pro Se 1 2022*

1    transfer). The Plaintiff reported this was incorrect and stated that, in particular, the shares were

2    transferred to AST and that the Defendants emailed the Plaintiff a receipt of the transaction. The

3    Plaintiff Read the email Verbatim to the Defendants; the Defendants advised that the Automated

4    Customer Account Transfer Service (ACATS) request was being initiated and processed. On or

5    About 12/9/2022, Plaintiff Called Defendant inquiring about the transfer progress, and

6    Defendant advised it had failed, and there would be a 2-4 week processing time. The Plaintiff

7    reported this was unacceptable and wanted to know what type of transfer was attempted. He also

8    advised that the call was being recorded for future legal action. Defendant consented to being

9    recorded. Plaintiff asked why the incorrect transfer type was initiated? Defendant advised it was

10   not the wrong type. After a few minutes of conversation about how the processes work, he

11   finally reported that the reason for the improper transfer type was to buy time for the Defendant

12   to assess their needs and concerns with this security as they had understood that FINRA actions

13   were most certainly coming soon in the next few days from when the transfer was initiated. The

14   Defendant stated they needed to protect themselves and be able to know how to move forward.

15   This, by definition, is Fraud. Plaintiff alleges on information and credence, and on that basis

16   alleges, that Defendants knowingly assisted Market Makers who appeared to have shorted

17   synthetic nonexistent shares of MMTLP stock and sold those nonexistent shares to Plaintiff and

18   other Washington residents, in violation of SEC REG SHO and a multitudinous of other laws

19   and statutes.

20        Seeing Defendants marketing and selling fictitious shares of MMTLP to Plaintiff while

21   maintaining that the Shares were legitimate long before December 12, 2022, Defendants knew

22   this was a problem. Upon information and credence, Plaintiff alleges that as Defendants knew

23   upwards of 300,000,000 illegal nonexistent shares were outstanding as to MMTLP as of about

24

*Pro Se 1 2022*

1  12-3-2022 because MMTLP was going to be canceled and moved into a private corporation

2  (NBH), Defendants knew:

3        A. That the Market Makers who had illegally shorted MMTLP with the assistance of and

4  facilitated by Defendants had to cover an enormous number of shares by a specific date (12-12-

5  2022)

6        B. That the shares they needed to cover their illegally created short positions that did not

7  exist required cover, and this would prove to be impossible.

8        11. Plaintiff alleges, on information and credence, that Defendants, who Today provides

9  investing and trading services for 11 million client accounts that total more than $1 trillion in

10  assets and custodial services for more than 6,000 independent registered investment advisors.

11  With clients placing, on average, approximately 500,000 trades each day, engages in the illegal

12  practices referenced above with Market Makers, facilitating the creation of Synthetic illicit

13  shares because those Market Makers supply Defendants with significant income and revenue and

14  "regulatory protection."

15        12. Plaintiff alleges, on info and belief, that seeing the incestuous relationship of Finance

16  to the regulatory bodies, that at best, the regulators have been knowingly inept in protecting the

17  rights of investors. Considering the Defendant's knowledge of the situation, and the pending

18  trading termination date (12-12-2022), starting 12-5-2022, at the latest, Defendants realized that

19  it would further exacerbate the risk to the entire financial system if they continued to help

20  facilitate the continued shorting of MMTLP stock (as there were significantly fewer shares

21  existing then were needed). Moreover, continuing this improper practice breached a fiduciary

22  duty owed by Defendants to its clients, including those in Washington State and the united states

23  who were shareholders of MMTLP, like Plaintiff.

24

COMPLAINT FOR A CIVIL CASE - 9

*Pro Se 1 2022*

13. Despite that, Defendants, who were already aware of the improper shorting tactics, even during the week of 12-5-2022, continued to help facilitate the shorting of MMTLP shares, seemingly after a U3 halt. Per the time frames, it was understood and logical that seeing the vast amount of synthetic illegal short shares and the need to cover with a fast-approaching date. Those short sellers, with Defendants' assistance, would need to immediately buy to cover (not short) hundreds of millions of shares of a stock that only had around 165,000,000 shares. Plaintiff is informed and believes, and alleges that seeing Defendant's involvement in this criminal enterprise with Market Makers, illegally marketing shares that did not exist, to Plaintiff and other Washington residents, that on or about 12-5-2022, and prior, Defendants knew that contrary to law, for some reason, that the short Market Makers would not have to cover their short positions legitimately. Despite the fact it breached a fiduciary duty to Plaintiff, Defendants helped facilitate the shorting of the MMTLP shares up through at least 12-8-2022. Because Defendants marketed and sold MMTLP shares and because of the nature of the transaction and dividend of the preferred stock (MMTLP), not only did Defendants have a duty to be aware of the details of the MMTLP transaction. In no way is it reasonable to believe that Defendants were unaware of all the essential facts related to the sequence of events. Hours after the Market Makers, facilitated by the Defendants, shorted the nonexistent MMTLP shares from $ 10 plus dollars to under $ 3 on 12-8-2022, FINRA placed an extremely rare U3 halt on trading (After. not during trading).

14. Plaintiff is informed and believes, and alleges, that before 12-8-2022, the Defendants were aware that a trading halt would be put in place on 12-8-2022 At the close of business. The Defendants terminated Plaintiff's rights even to decide if he wanted to go into NB. There is a dispute requiring an immediate determination for Plaintiff. Plaintiff contends that the Defendants have facilitated the unlawful shorting of nonexistent shares of MMTLP (and other securities) to

COMPLAINT FOR A CIVIL CASE - 10

*Pro Se 1 2022*

1   the detriment of Plaintiff and the citizens of Washington and the United States. Moreover, and

2   contrary to the fiduciary duty owed to Plaintiff, the Defendants helped facilitate circumstances

3   where the Market Making Short Sellers did not have to close and cover the positions (potentially

4   saving them Billions and putting substantial sums in the pockets of the Defendants and directly

5   harming Plaintiff and the residents of Washington.

6       15. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though

7   fully set forth herein. On and after September 2022, Defendant Defendants sold and marketed

8   MMTLP shares to Plaintiff on multiple occasions. Defendant represented that it was selling

9   legitimate and actual shares of MMTLP that could be freely traded and, on a specific date, either

10  sold or converted to NBH shares. Based on the false representations offered by and on behalf of

11  Defendants from October – December 2022 prior and after, in November 20222, and up through

12  early December 2022, Plaintiff purchased the MMTLP shares.

13

14      16. Plaintiff had determined, on information and credence, that the MMTLP shares sold

15  by Defendants to Plaintiff were nonexistent, fake, and illegal synthetic MMTLP shares, which

16  Defendants knew were illegitimate when they sold them to Plaintiff. Defendant marketed them

17  with the specific intent to deceive investors like Plaintiff. Moreover, despite demand, Defendant

18  has denied Plaintiff the ability to sell the MMTLP shares for a profit and decide whether he

19  wanted to proceed into the private NBH. Moreover, at the same time, Defendant has engaged in

20  conduct with Plaintiff to reduce the value of Plaintiff shares to his damages according to law. In

21  reliance on the Defendants' continuing false representations and promises, Plaintiff purchased the

22  subject MMTLP shares through Defendants on multiple occasions in 2022.

23      17. Plaintiff reasonably relied on the numerous misrepresentations of Defendants to buy

24  those shares. Contrary to what Defendants represented, the MMTLP shares were not legitimate,

COMPLAINT FOR A CIVIL CASE - 11

*Pro Se 1 2022*

1   Plaintiff could not dispose of the shares the way it was promised, and to add insult to Injury, at

2   the same time, and contrary to Defendants fiduciary duty owed to Plaintiff, Plaintiff is informed

3   and believes and thereon alleges, that they engaged in criminal misconduct enabling and

4   facilitating illegal short selling that reduced the value of Plaintiff holdings. But for all the false

5   promises, Plaintiff would never have engaged in this transaction through Defendant or at all. As

6   a proximate result of the harm caused by the intentional misconduct of Defendant, and each of

7   them, Plaintiff has been harmed in a sum according to proof. The representations offered by

8   Defendant were knowingly false and designed and intended to get Plaintiff to rely on same to

9   induce Plaintiff to give Defendants money to be used by Defendants against the interests of

10   Plaintiff. Contrary to their promises, Defendants intentionally and with malice lied about the

11   transactions of MMTLP intentionally to harm Plaintiff.

12        18. The conduct undertaken by Defendants, by and through their agents, was known and

13   authorized by Defendants' management and was undertaken with ill will, evil intent, and the

14   specific desire to misappropriate Plaintiff's monies. As such, and seeing the malicious acts of

15   Defendants, and each of them, Plaintiff is entitled to an award of punitive damages according to

16   proof. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully

17   set forth herein. According to Plaintiff's brokerage account agreement with Defendants, and

18   pursuant to the fiduciary relationship Defendants held as to Plaintiff, Defendants owed a duty of

19   care to Plaintiff regarding holding, using, and accounting for the monies Plaintiff provided to

20   Defendants and the securities that are legitimately held.

21        19. Plaintiff has no idea about the legitimacy of what is in his account or the calculations

22   of the same and the trail. In essence, Defendants are refusing to account. As a proximate failure

23   of Defendants to provide an accounting, Plaintiff has been harmed and is entitled to a complete

24   accounting. Plaintiff alleges the Defendants disseminated misleading statements to the investing

*Pro Se 1 2022*

1  public by stating the Defendants would provide the best execution for trade orders placed by

2  them for clients. The Plaintiff further alleges the orders subject to this practice lost value in the

3  form of economic loss due to (the client's) securities not being transferred to the Transfer agent

4  of record American Stock Transfer & Trust Company, LLC (AST). This is the only way the

5  security was to be transferred to be eligible for the assets of any future oil, gas sales, and or the

6  company sale.

7      20. This adversely affects the Security. This, in effect, makes the security worthless as it

8  is not eligible for asset distribution unless held in the client's name at the transfer agent.

9      21. The following is from MetaMeterials press release: It is not eligible for electronic

10  transfer after the settlement date. "Street name" or beneficial stockholders. Most META

11  stockholders own their shares of Series A Preferred Stock beneficially through a bank, broker or

12  other nominee. In these cases, the bank, broker or other nominee holds the shares in "street

13  name" and records such ownership on its books. If a holder owns shares of the Series A

14  Preferred Stock through a bank, broker or other nominee, the bank, broker or other nominee will

15  credit the holder's account with the whole shares of Next Bridge common Stock received in the

16  distribution on or shortly after the distribution date; however, shares of Next Bridge common

17  stock will not be eligible for electronic trading through DTC or any other established clearing

18  corporation. Therefore, META encourages these holders to contact their bank, broker or other

19  nominee to instruct such bank, broker or other nominee to transfer the shares of Series A

20  Preferred Stock to META's transfer agent on or prior to the record date such that each such

21  holder of Series A Preferred Stock is then the registered holder of the distributed shares of Next

22  Bridge common stock in book-entry form in a new account with META's transfer agent.

23  Holders of Series A **Preferred Stock who sell their shares on or before the record**

24  **date will not be entitled to receive the shares** of Next Bridge common stock in the

COMPLAINT FOR A CIVIL CASE - 13

*Pro Se 1 2022*

1  distribution in respect of such shares of Series A Preferred Stock sold. Holders of Series A

2  Preferred Stock who sell their shares after the record date but before the distribution date will be

3  required to transfer the shares of Next Bridge common stock received in the distribution to the

4  subsequent purchaser of Series A Preferred Stock. A registration statement on Form S-1 relating

5  to the shares subject to the distribution has been filed with the Securities and Exchange

6  Commission and became effective on November 18, 2022.

7      22. Plaintiff further requests that the Court order that the Defendants may not continue to

8  market, sell, or otherwise be involved in any respect in the unlawful shorting of stock. Plaintiff

9  also requests that a permanent injunction be ordered to block such illegal conduct perpetrated by

10  Defendants.

11      23. Plaintiff further demands that he receive full and fair compensation for their shares of

12  MMTLP and or NB.

13      24. Plaintiff asserts that Defendants is engaged in a criminal enterprise with Market

14  Makers, helping them undertake conduct contrary to the interests of Plaintiff also claims it is

15  entitled to damages From The Defendants plus legal fees and costs and requests that the Court

16  order the same. Plaintiff believes that the Defendants will deny this. Due to the exigency, an

17  immediate determination is required.

18      25. Plaintiff requests that the Court find that the Defendants are involved in

19  Racketeering as defined in the Federal Rico statutes. Defendants have engaged in multiple

20  predicate acts in a criminal enterprise with Market Makers and others that has affected interstate

21  commerce. It has involved a pattern of criminal activity including but not limited to the knowing

22  sale and marketing of nonexistent shares of securities across state lines affecting interstate

23  commerce. Moreover, the Defendants are a critical member of this criminal enterprise.

24

COMPLAINT FOR A CIVIL CASE - 14

*Pro Se 1 2022*

**Suitability**

Broker-dealers have to fulfill what is called a "suitability obligation," loosely defined as making recommendations that suit their client's best interests.  Some broker dealers feel this is unfair as it may affect them their ability to sell investment vehicles that benefit their bottom line. Still, all a suitability obligation means is that the broker dealer needs to believe that their decisions truly benefit their client. Suitability also includes making sure transaction costs are not excessive—called "churning" an account or racking up unnecessary trading fees—and that all recommendations benefit the client.

The SEC considers broker-dealers' financial intermediaries who help connect investors to individual investments. They play a crucial role in enhancing market liquidity and efficiency by linking the capital with investment products that range from common stocks, mutual funds, and other more complex vehicles. Such as variable annuities, futures, and options. One activity a dealer may carry out is selling a bond out of their firm's inventory of fixed-income securities. The primary income for a broker-dealer comes from commissions earned from making transactions for the underlying customer. Investment advisers are bound to a fiduciary standard that is regulated by the Securities and Exchange Commission (SEC) and state securities regulators hold advisers to a fiduciary standard that requires them to put their client's interests above their own. The act is specific in defining what a fiduciary means, stipulating that advisers must place their interests below that of their clients. It consists of a duty of loyalty and care. It also means advisers must do their best to make sure investment advice is made using accurate and complete information and that the analysis is as thorough as possible. Avoiding a conflict of interest is important when acting as a fiduciary, which means that advisers must disclose any potential conflicts. Additionally, advisers must place trades under a "best execution" standard,

COMPLAINT FOR A CIVIL CASE - 15

*Pro Se 1 2022*

1  meaning they must strive to trade securities with the best combination of low cost and efficient

2  execution.Marchese v. Shearson Hayden Stone, Inc., 734 F.2d 414, 418 (9th Cir. 1984).

3       Such a fiduciary relationship is characterized as an affirmative duty to use the utmost

4

5  good faith. Id.This duty carries with it the obligation to disclose all material facts fully and fairly.

6                                          **FINRA**

7       Financial Industry Regulatory Authority (FINRA) uses market surveillance as part of its

8  mission to protect investors and promote market integrity. FINRA is a self-regulatory

9  organization authorized by Congress to regulate the securities industry.

10      To fulfill its role, FINRA uses various tools and techniques to monitor the markets and

11  detect any instances of illegal or unethical behavior, including illegal naked short selling and

12  selling of Counterfeit securities. Methods used by FINRA for market surveillance include:

13      Real-time monitoring to monitor securities transactions and detect any suspicious or

14  unusual activity.

15      Data analytics analyzes large amounts of trade data and detects any patterns Or trends

16  that may indicate illegal or unethical behavior.

17      Compliance systems are in place to ensure that all securities transactions comply with

18  applicable regulations and laws. FINRA also has teams of compliance professionals who

19  regularly review and monitor the markets for signs of illegal or unethical behavior.

20      FINRA's market surveillance efforts are designed to protect investors, promote market

21  integrity, and help detect and prevent any instances of illegal or unethical behavior. If there is a

22  case of fraud within FINRA, it should be taken very seriously, and prompt action should be taken

23  to investigate and address the issue.

24

COMPLAINT FOR A CIVIL CASE - 16

*Pro Se 1 2022*

1   FINRA is responsible for regulating securities firms and protecting investors, so it should
have a strong interest in ensuring that fraud is detected and prevented

2
in the markets it oversees. If fraud is discovered within FINRA, the following steps:

3
4   FINRA has an internal audit, compliance, and enforcement team that investigates any
reported cases of fraud. This team must conduct a thorough investigation to determine the extent

5
of the fraud and identify any individuals involved, including instances involving FINRA

6
employees.

7
8   If the internal investigation reveals evidence of fraud, FINRA should report the matter to
the relevant authorities, such as the SEC, the Department of Justice, or other regulatory agencies.

9
10   FINRA has the authority to take disciplinary action against individuals and firms that
engage in fraud or other illegal activities. This may include fines, suspension of licenses, and

11
12   even expulsion from the securities industry. FINRA should fully cooperate with any authorities
investigating the matter, providing any information and support needed to bring the perpetrators

13
14   to justice. FINRA should also take steps to remediate any harm caused by the fraud and to
prevent similar incidents from happening in the future. This may include changes to internal

15
16   processes, systems, and controls and implementing new risk management strategies.

17   FINRA should be committed to ensuring the integrity and fairness of the Financial
markets and take any fraud instances very seriously. If fraud is discovered, FINRA should work

18
19   quickly and efficiently to investigate and address the issue and ensure appropriate action is taken
against any responsible individuals. FINRA has a board of directors employed by the same

20
companies that are committing fraud against the market. They cannot be trusted to do these

21
22   things prescribed here even though it is their duty to do so. We have watched them sit silently as
we have reported these issues.

23
24   If FINRA fails to investigate cases of fraud properly, it should have serious consequences

COMPLAINT FOR A CIVIL CASE - 17

*Pro Se 1 2022*

1  to ensure the integrity of the financial markets and maintain investor confidence. It could

2  undermine public trust in the regulatory body and the financial markets. This results in financial

3  losses for investors, which could further erode public confidence in the financial markets.

4      When FINRA failed to investigate this fraud case properly, it opened itself up to lawsuits

5  from investors who realized their interests were not adequately protected. It must result in

6  regulatory action being taken against the organization by other authorities, such as the SEC,

7  DOJ, Federal Courts, and Congress. It is essential for other regulatory bodies to step in and take

8  appropriate action to ensure that the financial markets remain fair and transparent. This includes

9  taking enforcement action against FINRA, conducting its investigation, or referring the case to

10  other authorities for prosecution. This is a case of fraud within FINRA, it should have been taken

11  very seriously, and prompt action should have been taken to investigate and address the issue.

12  FINRA is responsible for regulating securities firms and protecting investors. Finra is

13  accountable for ensuring that fraud is detected and prevented in the markets it oversees.

14                            **S.E.C.**

15  The Securities and Exchange Commission (S.E.C.) uses market surveillance as part of its

16  mission to protect investors and maintain fair, orderly, and efficient markets.

17  The S.E.C.'s market surveillance efforts are designed to protect investors, maintain fair, orderly,

18  and efficient markets, and help detect and prevent any instances of illegal or unethical behavior,

19  including illegal naked short selling and selling of Counterfeit securities.

20      The S.E.C. is a federal agency responsible for regulating the securities industry and

21  enforcing federal securities laws. To fulfill its role, the S.E.C. uses various tools and techniques

22  to monitor the markets and detect any instances of illegal or unethical behavior.

23      The S.E.C. uses real-time systems to monitor securities transactions and detect suspicious

24  or unusual activity.

COMPLAINT FOR A CIVIL CASE - 18

*Pro Se 1 2022*

1    Compliance systems are in place to ensure that all securities transactions comply with

2    applicable regulations and laws. Data analytics analyze large amounts of trade data and detect

3    patterns or trends indicating illegal or unethical behavior.

4    The S.E.C. also has teams of compliance professionals who regularly review and monitor

5    the markets for signs of illegal or unethical behavior.

6    FINRA and the S.E.C. failed to stop fraud because they refused to act or were complicit.

7    Retail investors have suffered significant financial losses, which could have severe impacts for

8    their economic well-being. Fraud in the financial markets can take many forms, and it can be

9    committed by individuals or entities who take advantage of the lack of market oversight or

10   regulation. In such cases, retail investors who fall victim to the fraud could suffer severe

11   financial losses, which include the following: Retail investors who fall victim to financial fraud

12   could lose a significant portion of their savings, which could make it difficult for them to meet

13   their financial obligations and to achieve their financial goals. Retail investors have lost their

14   retirement savings, which could devastate their financial security in their later years. Because

15   FINRA and the S.E.C. failed to stop this fraud, retail investors have incurred significant debt to

16   cover their losses, which could make it difficult for them to achieve their financial goals and

17   meet their financial obligations. Experience a decreased quality of life, as they may have to make

18   significant lifestyle changes to accommodate their financial losses.

19   It is clear that they have epically failed. It is the responsibility of FINRA and the S.E.C.

20   to take appropriate action to prevent fraud in the financial markets and to protect the interests of

21   retail investors. By taking swift and effective action, these regulatory bodies are entrusted with

22   ensuring that the financial markets remain fair, transparent, and in compliance with the law and

23   that investors' interests are adequately protected.

24   Again, they have epically failed. Retail investors who have suffered financial losses due

COMPLAINT FOR A CIVIL CASE - 19

Pro Se 1 2022

1   to fraud have filed complaints with the S.E.C. The S.E.C. investigates complaints and takes

2   enforcement action against individuals or entities that violate federal securities laws and

3   regulations.

4    Retail investors who have suffered financial losses due to fraud have filed complaints with

5   FINRA. FINRA investigates complaints and takes enforcement action against individuals or

6   firms that violate FINRA rules and regulations. Again, they have epically failed.

7   While it is essential for FINRA and the S.E.C. to take appropriate action to prevent fraud in the

8   financial markets, retail investors who have suffered financial losses due to fraud can take steps

9   to seek recovery of their losses and hold the responsible parties accountable.

10  If FINRA and the S.E.C. were to fail in their duty to prevent and investigate fraud in the

11  financial markets, there would be valid concerns about their ability to investigate themselves. In

12  this case, it is appropriate for an independent, outside agency to investigate to ensure impartiality

13  and avoid any potential conflicts of interest. Additionally, there is evidence of systemic failures

14  within FINRA or the S.E.C., so it is necessary for Congress or another government agency to

15  take action. In any case, it is essential for regulatory bodies to be held accountable for their

16  actions and for any failures to be thoroughly investigated and addressed. This helps maintain the

17  financial markets' integrity and protect the interests of retail investors. The S.E.C. failed to

18  investigate FINRA for committing fraud, undermining public trust in the regulatory bodies and

19  the financial markets as a whole. The S.E.C.'s reputation has been damaged for failing to

20  investigate FINRA for committing fraud, which could negatively impact its ability to regulate the

21  markets in the future effectively. It opened itself up to lawsuits from investors who felt their

22  interests needed to be adequately protected. It resulted in financial losses for investors, which

23  could further erode public trust in the financial markets. It is essential for the S.E.C. to take its

24  enforcement and regulatory responsibilities seriously and to take prompt action if FINRA or any

COMPLAINT FOR A CIVIL CASE - 20

*Pro Se 1 2022*

1   other regulatory body is suspected of committing fraud. This may include conducting its

2   investigation into the matter, referring the case to other authorities for prosecution, or taking

3   enforcement action against FINRA or other parties. By taking swift and effective action, the

4   S.E.C. can ensure that the financial markets remain fair and transparent and that investors'

5   interests are adequately protected. Again, they failed epically.

6

7   **18 U.S.C. §1006. Federal credit institution entries, reports and transactions**

8   Whoever, being an officer, agent or employee of or connected in any capacity with the Federal

9   Deposit Insurance Corporation, National Credit Union Administration, any Federal home loan

10  bank, the Federal Housing Finance Agency, Farm Credit Administration, Department of Housing

11  and Urban Development, Federal Crop Insurance Corporation, the Secretary of Agriculture

12  acting through the Farmers Home Administration or successor agency, the Rural Development

13  Administration or successor agency, or the Farm Credit System Insurance Corporation, a Farm

14  Credit Bank, a bank for cooperatives or any lending, mortgage, insurance, credit or savings and

15  loan corporation or association authorized or acting under the laws of the United States or any

16  institution, other than an insured bank (as defined in section 656), the accounts of which are

17  insured by the Federal Deposit Insurance Corporation, or by the National Credit Union

18  Administration Board or any small business investment company, with intent to defraud any

19  such institution or any other company, body politic or corporate, or any individual, or to deceive

20  any officer, auditor, examiner or agent of any such institution or of department or agency of the

21  United States, makes any false entry in any book, report or statement of or to any such

22  institution, or without being duly authorized, draws any order or bill of exchange, makes any

23  acceptance, or issues, puts forth or assigns any note, debenture, bond or other obligation, or draft,

24  bill of exchange, mortgage, judgment, or decree, or, with intent to defraud the United States or

*Pro Se 1 2022*

1  any agency thereof, or any corporation, institution, or association referred to in this section,

2  participates or shares in or receives directly or indirectly any money, profit, property, or benefits

3  through any transaction, loan, commission, contract, or any other act of any such corporation,

4  institution, or association, shall be fined not more than $1,000,000 or imprisoned not more than

5  30 years, or both

6  (June 25, 1948, ch. 645, 62 Stat. 750; May 24, 1949, ch. 139, §20, 63 Stat. 92; July 28, 1956, ch.
   773, §2, 70 Stat. 714; Pub. L. 85–699, title VII, §704, Aug. 21, 1958, 72 Stat. 698; Pub. L. 87–
7  353, §3(s), Oct. 4, 1961, 75 Stat. 774; Pub. L. 90–19, §24(a), May 25, 1967, 81 Stat. 27; Pub. L.
   91–468, §6, Oct. 19, 1970, 84 Stat. 1016; Pub. L. 101–73, title IX, §§961(e), 962(a)(7), (8)(A),
8  Aug. 9, 1989, 103 Stat. 500, 502; Pub. L. 101–624, title XXIII, §2303(e), Nov. 28, 1990, 104
   Stat. 3981; Pub. L. 101–647, title XVI, §1603, title XXV, §§2504(e), 2595(a)(4), Nov. 29, 1990,
9  104 Stat. 4843, 4861, 4907; Pub. L. 103–322, title XXXIII, §330004(6), Sept. 13, 1994, 108 Stat.
   2141; Pub. L. 106–78, title VII, §767, Oct. 22, 1999, 113 Stat. 1174; Pub. L. 110–289, div. A,
10 title II, §1216(c), July 30, 2008, 122 Stat. 2792; Pub. L. 111–203, title III, §377(5), July 21,
   2010, 124 Stat. 1569.)

11

12                                          **DTCC**

13      Depository Trust Company (DTC) uses market surveillance as part of its mission to

14  provide critical infrastructure services for the clearing, settlement, and safekeeping of securities

15  transactions. DTC is a subsidiary of the Depository Trust & Clearing Corporation (DTCC) and is

16  one of the largest securities depositories in the world. To fulfill its role, DTC uses various tools

17  and techniques to monitor the markets and detect any instances of illegal or unethical behavior,

18  including illegal naked short selling and selling of Counterfeit securities.

19  DTC provides services for the clearing, settlement, and safekeeping of securities transactions,

20  including the electronic transfer of securities and the safekeeping of physical certificates.

21      In summary, DTCC is a holding company that coordinates the activities of its subsidiary

22  organizations. At the same time, DTC and NSCC provide specific services related to the

23  clearing, settlement, and safekeeping of securities transactions. All three organizations play

24

*Pro Se 1 2022*

1  essential roles in promoting stability, safety, and efficiency in the financial markets. In this

2  instance, we had complete failures in all of the above-mentioned systems that were in place to

3  protect investors. They claim to do the following, and we can clearly see they did none to protect

4  the individual investors. The DTCC has robust systems and processes to detect and prevent

5  fraud. The DTCC has an internal audit and compliance team that investigates any reported cases

6  of fraud. This team will conduct a thorough investigation to determine the extent of the fraud and

7  identify any individuals involved. If the internal investigation reveals evidence of fraud, the

8  DTCC will report the matter to the relevant authorities, such as the SEC, FINRA, and the

9  Department of Justice. The DTCC will fully cooperate with any authorities investigating the

10  matter, providing any information and support needed to bring the perpetrators to justice The

11  DTCC will take steps to remediate any harm caused by the fraud and to prevent similar incidents

12  from happening in the future. This may include changes to internal processes, systems, and

13  controls, as well as implementing new risk management strategies.

14    Instead, they allowed fraud to be continued, and detrimentally affected retail trading. The

15  DTCC should be committed to ensuring the integrity and security of the financial markets and

16  should consider any instances of fraud very seriously. If fraud is discovered, the DTCC should

17  work quickly and efficiently to investigate and address the issue and ensure appropriate action is

18  taken against any responsible individuals.

19    All three organizations play essential roles in promoting stability, safety, and efficiency

20  in the financial markets. All of their safeguards and processes designed to protect the investors

21  were a complete failure.The following departments have been notified, and supporting

22  documentation was turned in to them without investigations into Finra or the S.E.C.

23    The Office of Inspector General (OIG): This is an independent office that conducts

24  audits, inspections, and investigations to identify and prevent fraud, waste, and abuse. The OIG

COMPLAINT FOR A CIVIL CASE - 23

*Pro Se 1 2022*

1   can independently review the S.E.C.'s activities, including its enforcement and regulatory

2   functions.

3       The Government Accountability Office (G.A.O.): This is an independent, non-partisan

4   agency that provides Congress with objective and reliable information to help it make informed

5   decisions. The G.A.O. can conduct audits and investigations of federal agencies, including

6   FINRA and the S.E.C., and provide recommendations for improvement.

7       The Department of Justice (D.O.J.): The D.O.J. is responsible for enforcing federal laws

8   and can conduct investigations into allegations of fraud, including in the financial markets. The

9   D.O.J. can provide an impartial and independent investigation into any potential wrongdoing by

10   FINRA or the S.E.C.

11       State attorneys general can also play a role in investigating and prosecuting fraud in the

12   financial markets. They can provide an impartial and independent review of any potential

13   wrongdoing by FINRA or the S.E.C. In any case, it is crucial to have an independent and

14   impartial investigation to ensure that the integrity of the financial markets is maintained and that

15   the interests of retail investors are protected.

16   The Commodity Futures Trading Commission (CFTC): The CFTC is an independent agency

17   regulating U.S. derivatives markets, including futures and options. The CFTC can provide an

18   impartial and independent review of any potential wrongdoing in the derivatives markets,

19   including by FINRA or the S.E.C.

20       The Consumer Financial Protection Bureau (CFPB): The CFPB is an independent

21   agency that protects consumers by enforcing federal consumer financial laws and educating and

22   empowering consumers to make informed financial decisions. The CFPB can provide an

23   impartial and independent investigation into any potential violations of consumer financial laws,

24   including by FINRA or the S.E.C. It is appropriate for an independent, outside agency to

COMPLAINT FOR A CIVIL CASE - 24

*Pro Se 1 2022*

1   investigate to ensure impartiality and avoid any potential conflicts of interest.

2

3   ### 814. False Statements (18 U.S.C. § 1014)

4   Section 1014 of Title 18, United States Code, covers the knowing making of false statements or

5   willfully overvaluing any property or security for the purpose of influencing in any way the

6   action of the enumerated agencies and organizations.Venue is governed by the general rule under

7   the various false statement and false claim statutes. See United States v. Blecker, 657 F.2d 629,

8   632 (4th Cir. 1981), cert. denied, 454 U.S. 1150 (1982)(false claim statute). A violation of

9   section 1014 is indictable either in the district in which the false statement is prepared and

10   mailed, or in which the statement is received. See United States v. Wuagneux, 683 F.2d 1343,

11   1356 (11th Cir. 1982), cert. denied, 464 U.S. 814 (1983).

12   Generally, the making of a number of false statements to a lending institution in a single

13   document constitutes only one criminal violation under section 1014. See United States v. Sue,

14   586 F.2d 70, 71 (8th Cir. 1978). See also United States v. Thibadeau, 671 F.2d 75, 79 (2d Cir.

15   1982). However, in Bins v. United States, 331 F.2d 390 (5th Cir.), cert. denied, 379 U.S. 880

16   (1964), the court of appeals found duplicity in an indictment that charged the defendant in each

17   count with making false statements on two different FHA forms. In United States v. Canas, 595

18   F.2d 73, 78 (5th Cir. 1979), the United States Court of Appeals for the Fifth Circuit distinguished

19   Bins and found that an indictment can properly charge in a single count false statements made on

20   different documents as long as the documents are necessary parts of a loan package meant to

21   obtain a single loan. [cited in JM 9-40.000]

22

23   ### §1033. Crimes by or affecting persons engaged in the business of insurance whose activities affect interstate commerce

24

COMPLAINT FOR A CIVIL CASE - 25

*Pro Se 1 2022*

1  (a)(1) Whoever is engaged in the business of insurance whose activities affect interstate

2  commerce and knowingly, with the intent to deceive, makes any false material statement or

3  report or willfully and materially overvalues any land, property or security—

4  (A) in connection with any financial reports or documents presented to any insurance regulatory

5  official or agency or an agent or examiner appointed by such official or agency to examine the

6  affairs of such person, and (B) for the purpose of influencing the actions of such official or

7  agency or such an appointed agent or examiner, shall be punished as provided in paragraph (2).

8  (2) The punishment for an offense under paragraph (1) is a fine as established under this title or

9  imprisonment for not more than 10 years, or both, except that the term of imprisonment shall be

10  not more than 15 years if the statement or report or overvaluing of land, property, or security

11  jeopardized the safety and soundness of an insurer and was a significant cause of such insurer

12  being placed in conservation, rehabilitation, or liquidation by an appropriate court.

13  (b)(1) Whoever—(A) acting as, or being an officer, director, agent, or employee of, any person

14  engaged in the business of insurance whose activities affect interstate commerce, or

15  (B) is engaged in the business of insurance whose activities affect interstate commerce or is

16  involved (other than as an insured or beneficiary under a policy of insurance) in a transaction

17  relating to the conduct of affairs of such a business, willfully embezzles, abstracts, purloins, or

18  misappropriates any of the moneys, funds, premiums, credits, or other property of such person so

19  engaged shall be punished as provided in paragraph (2). (2) The punishment for an offense under

20  paragraph (1) is a fine as provided under this title or imprisonment for not more than 10 years, or

21  both, except that if such embezzlement, abstraction, purloining, or misappropriation described in

22  paragraph (1) jeopardized the safety and soundness of an insurer and was a significant cause of

23  such insurer being placed in conservation, rehabilitation, or liquidation by an appropriate court,

24  such imprisonment shall be not more than 15 years. If the amount or value so embezzled,

*Pro Se 1 2022*

1    abstracted, purloined, or misappropriated does not exceed $5,000, whoever violates paragraph

2    (1) shall be fined as provided in this title or imprisoned not more than one year, or both.

3    (c)(1) Whoever is engaged in the business of insurance and whose activities affect interstate

4    commerce or is involved (other than as an insured or beneficiary under a policy of insurance) in

5    a transaction relating to the conduct of affairs of such a business, knowingly makes any false

6    entry of material fact in any book, report, or statement of such person engaged in the business of

7    insurance with intent to deceive any person, including any officer, employee, or agent of such

8    person engaged in the business of insurance, any insurance regulatory official or agency, or any

9    agent or examiner appointed by such official or agency to examine the affairs of such person,

10    about the financial condition or solvency of such business shall be punished as provided in

11    paragraph (2).  (2) The punishment for an offense under paragraph (1) is a fine as provided under

12    this title or imprisonment for not more than 10 years, or both, except that if the false entry in any

13    book, report, or statement of such person jeopardized the safety and soundness of an insurer and

14    was a significant cause of such insurer being placed in conservation, rehabilitation, or liquidation

15    by an appropriate court, such imprisonment shall be not more than 15 years.

16    (d) Whoever, by threats or force or by any threatening letter or communication, corruptly

17    influences, obstructs, or impedes or endeavors corruptly to influence, obstruct, or impede the due

18    and proper administration of the law under which any proceeding involving the business of

19    insurance whose activities affect interstate commerce is pending before any insurance regulatory

20    official or agency or any agent or examiner appointed by such official or agency to examine the

21    affairs of a person engaged in the business of insurance whose activities affect interstate

22    commerce, shall be fined as provided in this title or imprisoned not more than 10 years, or both.

23    (e)(1)(A) Any individual who has been convicted of any criminal felony involving dishonesty or

24    a breach of trust, or who has been convicted of an offense under this section, and who willfully

*Pro Se 1 2022*

1    engages in the business of insurance whose activities affect interstate commerce or participates

2    in such business, shall be fined as provided in this title or imprisoned not more than 5 years, or

3    both. (B) Any individual who is engaged in the business of insurance whose activities affect

4    interstate commerce and who willfully permits the participation described in subparagraph (A)

5    shall be fined as provided in this title or imprisoned not more than 5 years, or both.

6    (2) A person described in paragraph (1)(A) may engage in the business of insurance or

7    participate in such business if such person has the written consent of any insurance regulatory

8    official authorized to regulate the insurer, which consent specifically refers to this subsection.

9    (f) As used in this section—(1) the term "business of insurance" means—(A) the writing of

10   insurance, or(B) the reinsuring of risks, by an insurer, including all acts necessary or incidental to

11   such writing or reinsuring and the activities of persons who act as, or are, officers, directors,

12   agents, or employees of insurers or who are other persons authorized to act on behalf of such

13   persons; (2) the term "insurer" means any entity the business activity of which is the writing of

14   insurance or the reinsuring of risks, and includes any person who acts as, or is, an officer,

15   director, agent, or employee of that business;(3) the term "interstate commerce" means—

16   (A) commerce within the District of Columbia, or any territory or possession of the United

17   States; (B) all commerce between any point in the State, territory, possession, or the District of

18   Columbia and any point outside thereof; (C) all commerce between points within the same State

19   through any place outside such State; or (D) all other commerce over which the United States has

20   jurisdiction; and (4) the term "State" includes any State, the District of Columbia, the

21   Commonwealth of Puerto Rico, the Northern Mariana Islands, the Virgin Islands, American

22   Samoa, and the Trust Territory of the Pacific Islands.

23   (Added Pub. L. 103–322, title XXXII, §320603(a), Sept. 13, 1994, 108 Stat. 2115.)

24

COMPLAINT FOR A CIVIL CASE - 28

### §1037. Fraud and related activity in connection with electronic mail

(a) In General.—Whoever, in or affecting interstate or foreign commerce, knowingly—(1) accesses a protected computer without authorization, and intentionally initiates the transmission of multiple commercial electronic mail messages from or through such computer, (2) uses a protected computer to relay or retransmit multiple commercial electronic mail messages, with the intent to deceive or mislead recipients, or any Internet access service, as to the origin of such messages,(3) materially falsifies header information in multiple commercial electronic mail messages and intentionally initiates the transmission of such messages,(4) registers, using information that materially falsifies the identity of the actual registrant, for five or more electronic mail accounts or online user accounts or two or more domain names, and intentionally initiates the transmission of multiple commercial electronic mail messages from any combination of such accounts or domain names, or (5) falsely represents oneself to be the registrant or the legitimate successor in interest to the registrant of 5 or more Internet Protocol addresses, and intentionally initiates the transmission of multiple commercial electronic mail messages from such addresses, or conspires to do so, shall be punished as provided in subsection (b). (b) Penalties.—The punishment for an offense under subsection (a) is—(1) a fine under this title, imprisonment for not more than 5 years, or both, if—(A) the offense is committed in furtherance of any felony under the laws of the United States or of any State; or(B) the defendant has previously been convicted under this section or section 1030, or under the law of any State for conduct involving the transmission of multiple commercial electronic mail messages or unauthorized access to a computer system;(2) a fine under this title, imprisonment for not more than 3 years, or both, if—(A) the offense is an offense under subsection (a)(1); (B) the offense is an offense under subsection (a)(4) and involved 20 or more falsified electronic mail or online user account registrations, or 10 or more falsified domain name registrations; (C) the volume of

*Pro Se 1 2022*

1    electronic mail messages transmitted in furtherance of the offense exceeded 2,500 during any 24-

2    hour period, 25,000 during any 30-day period, or 250,000 during any 1-year period; (D) the

3    offense caused loss to one or more persons aggregating $5,000 or more in value during any 1-

4    year period; (E) as a result of the offense any individual committing the offense obtained

5    anything of value aggregating $5,000 or more during any 1-year period; or (F) the offense was

6    undertaken by the defendant in concert with three or more other persons with respect to whom

7    the defendant occupied a position of organizer or leader; and (3) a fine under this title or

8    imprisonment for not more than 1 year, or both, in any other case. (c) Forfeiture.—(1) In

9    general—The court, in imposing sentence on a person who is convicted of an offense under this

10   section, shall order that the defendant forfeit to the United States—(A) any property, real or

11   personal, constituting or traceable to gross proceeds obtained from such offense; and

12   (B) any equipment, software, or other technology used or intended to be used to commit or to

13   facilitate the commission of such offense.(2) Procedures.—The procedures set forth in section

14   413 of the Controlled Substances Act (21 U.S.C. 853), other than subsection (d) of that section,

15   and in Rule 32.2 of the Federal Rules of Criminal Procedure, shall apply to all stages of a

16   criminal forfeiture proceeding under this section. (d) Definitions.—In this section: (1) Loss.—

17   The term "loss" has the meaning given that term in section 1030(e) of this title. (2) Materially.—

18   For purposes of paragraphs (3) and (4) of subsection (a), header information or registration

19   information is materially falsified if it is altered or concealed in a manner that would impair the

20   ability of a recipient of the message, an Internet access service processing the message on behalf

21   of a recipient, a person alleging a violation of this section, or a law enforcement agency to

22   identify, locate, or respond to a person who initiated the electronic mail message or to investigate

23   the alleged violation. (3) Multiple.—The term "multiple" means more than 100 electronic mail

24   messages during a 24-hour period, more than 1,000 electronic mail messages during a 30-day

COMPLAINT FOR A CIVIL CASE - 30

*Pro Se 1 2022*

1   period, or more than 10,000 electronic mail messages during a 1-year period. (4) Other terms.—

2   Any other term has the meaning given that term by section 3 of the CAN-SPAM Act of 2003.

3   (Added Pub. L. 108–187, §4(a)(1), Dec. 16, 2003, 117 Stat. 2703.)

4

5   ### §1038. False information and hoaxes

6   (a) Criminal Violation.

7       (1) In general.—Whoever engages in any conduct with intent to convey

8   false or misleading information under circumstances where such information may reasonably be

9   believed and where such information indicates that an activity has taken, is taking, or will take

10  place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this

11  title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the

12  second sentence of section 46504, section 46505(b)(3) or (c), section 46506 if homicide or

13  attempted homicide is involved, or section 60123(b) of title 49, shall (A) be fined under this title

14  or imprisoned not more than 5 years, or both (B) if serious bodily injury results, be fined under

15  this title or imprisoned not more than 20 years, or both; and (C) if death results, be fined under

16  this title or imprisoned for any number of years up to life, or both.

17      (2) Armed forces.—Any person who makes a false statement, with intent to convey false

18  or misleading information, about the death, injury, capture, or disappearance of a member of the

19  Armed Forces of the United States during a war or armed conflict in which the United States is

20  engaged—(A) shall be fined under this title, imprisoned not more than 5 years, or both;

21  (B) if serious bodily injury results, shall be fined under this title, imprisoned not more than 20

22  years, or both; and(C) if death results, shall be fined under this title, imprisoned for any number

23  of years or for life, or both.(b) Civil Action.—Whoever engages in any conduct with intent to

24  convey false or misleading information under circumstances where such information may

COMPLAINT FOR A CIVIL CASE - 31

*Pro Se 1 2022*

1  reasonably be believed and where such information indicates that an activity has taken, is taking,

2  or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B

3  of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502,

4  the second sentence of section 46504, section 46505 (b)(3) or (c), section 46506 if homicide or

5  attempted homicide is involved, or section 60123(b) of title 49 is liable in a civil action to any

6  party incurring expenses incident to any emergency or investigative response to that conduct, for

7  those expenses. (c) Reimbursement.

8      (1) In general.—The court, in imposing a sentence on a defendant who has been

9  convicted of an offense under subsection (a), shall order the defendant to reimburse any state or

10  local government, or private not-for-profit organization that provides fire or rescue service

11  incurring expenses incident to any emergency or investigative response to that conduct, for those

12  expenses.

13      (2) Liability.—A person ordered to make reimbursement under this subsection shall be

14  jointly and severally liable for such expenses with each other person, if any, who is ordered to

15  make reimbursement under this subsection for the same expenses.

16      (3) Civil judgment.—An order of reimbursement under this subsection shall, for the

17  purposes of enforcement, be treated as a civil judgment. (d) Activities of Law Enforcement.—

18  This section does not prohibit any lawfully authorized investigative, protective, or intelligence

19  activity of a law enforcement agency of the United States, a State, or political subdivision of a

20  State, or of an intelligence agency of the United States.

21  (Added Pub. L. 108–458, title VI, §6702(a), Dec. 17, 2004, 118 Stat. 3764.)

22

23      **940. 18 U.S.C. SECTION 1341—ELEMENTS OF MAIL FRAUD**

24  "There are two elements in mail fraud: (1) having devised or intending to devise a scheme to

*Pro Se 1 2022*

1   defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of

2   executing, or attempting to execute, the scheme (or specified fraudulent acts)." Schmuck v.

3   United States, 489 U.S. 705, 721 n. 10 (1989); see also Pereira v. United States, 347 U.S. 1, 8

4   (1954) ("The elements of the offense of mail fraud under . . . § 1341 are (1) a scheme to defraud,

5   and (2) the mailing of a letter, etc., for the purpose of executing the scheme."); Laura A. Eilers &

6   Harvey B. Silikovitz, Mail and Wire Fraud, 31 Am. Crim. L. Rev. 703, 704 (1994) (cases cited).

7   [cited in JM 9-43.100]

8                    **941. 18 U.S.C. 1343—ELEMENTS OF WIRE FRAUD**

9   THE ELEMENTS OF WIRE FRAUD UNDER SECTION 1343 DIRECTLY PARALLEL

10  THOSE OF THE MAIL FRAUD STATUTE, BUT REQUIRE THE USE OF AN

11  INTERSTATE TELEPHONE CALL OR ELECTRONIC COMMUNICATION MADE IN

12  FURTHERANCE OF THE SCHEME. UNITED STATES V. BRISCOE, 65 F.3D 576, 583

13  (7TH CIR. 1995) (CITING UNITED STATES V. AMES SINTERING CO., 927 F.2D 232, 234

14  (6TH CIR. 1990) (PER CURIAM)); UNITED STATES V. FREY, 42 F.3D 795, 797 (3D CIR.

15  1994) (WIRE FRAUD IS IDENTICAL TO MAIL FRAUD STATUTE EXCEPT THAT IT

16  SPEAKS OF COMMUNICATIONS TRANSMITTED BY WIRE); SEE ALSO, E.G., UNITED

17  STATES V. PROFIT, 49 F.3D 404, 406 N. 1 (8TH CIR.) (THE FOUR ESSENTIAL

18  ELEMENTS OF THE CRIME OF WIRE FRAUD ARE: (1) THAT THE DEFENDANT

19  VOLUNTARILY AND INTENTIONALLY DEVISED OR PARTICIPATED IN A SCHEME

20  TO DEFRAUD ANOTHER OUT OF MONEY; (2) THAT THE DEFENDANT DID SO WITH

21  THE INTENT TO DEFRAUD; (3) THAT IT WAS REASONABLY FORESEEABLE THAT

22  INTERSTATE WIRE COMMUNICATIONS WOULD BE USED; AND (4) THAT

23  INTERSTATE WIRE COMMUNICATIONS WERE IN FACT USED) (CITING MANUAL OF

24  MODEL CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE

*Pro Se 1 2022*

1   EIGHTH CIRCUIT 6.18.1341 (WEST 1994)), CERT. DENIED, 115 S.CT. 2289 (1995);

2   UNITED STATES V. HANSON, 41 F.3D 580, 583 (10TH CIR. 1994) (TWO ELEMENTS

3   COMPRISE THE CRIME OF WIRE FRAUD: (1) A SCHEME OR ARTIFICE TO DEFRAUD;

4   AND (2) USE OF INTERSTATE WIRE COMMUNICATION TO FACILITATE THAT

5   SCHEME); UNITED STATES V. FAULKNER, 17 F.3D 745, 771 (5TH CIR. 1994)

6   (ESSENTIAL ELEMENTS OF WIRE FRAUD ARE: (1) A SCHEME TO DEFRAUD AND (2)

7   THE USE OF, OR CAUSING THE USE OF, INTERSTATE WIRE COMMUNICATIONS TO

8   EXECUTE THE SCHEME), CERT. DENIED, 115 S.CT. 193 (1995); UNITED STATES V.

9   CASSIERE, 4 F.3D 1006 (1ST CIR. 1993) (TO PROVE WIRE FRAUD GOVERNMENT

10   MUST SHOW (1) SCHEME TO DEFRAUD BY MEANS OF FALSE PRETENSES, (2)

11   DEFENDANT'S KNOWING AND WILLFUL PARTICIPATION IN SCHEME WITH

12   INTENT TO DEFRAUD, AND (3) USE OF INTERSTATE WIRE COMMUNICATIONS IN

13   FURTHERANCE OF SCHEME); UNITED STATES V. MAXWELL, 920 F.2D 1028, 1035

14   (D.C. CIR. 1990) ("WIRE FRAUD REQUIRES PROOF OF (1) A SCHEME TO DEFRAUD;

15   AND (2) THE USE OF AN INTERSTATE WIRE COMMUNICATION TO FURTHER THE

16   SCHEME."). [CITED IN JM 9-43.100]

17   **942. THE SCHEME AND ARTIFICE TO DEFRAUD**

18   THE WIRE FRAUD STATUTE WAS PATTERNED AFTER THE MAIL FRAUD

19   STATUTES. UNITED STATES V. LEMON, 941 F.2D 309, 316 (5TH CIR. 1991); UNITED

20   STATES V. CASTILLO, 829 F.2D 1194, 1198 (1ST CIR. 1987). THUS, THE SAME

21   PRINCIPLES APPLY IN DEFINING "SCHEME TO DEFRAUD" FOR MAIL AND WIRE

22   FRAUD PROSECUTIONS. SEE CARPENTER V. UNITED STATES, 484 U.S. 19, 25 N. 6

23   (1987) ("THE MAIL AND WIRE FRAUD STATUTES SHARE THE SAME LANGUAGE IN

24   RELEVANT PART, AND ACCORDINGLY WE APPLY THE SAME ANALYSIS TO BOTH

1    SETS OF OFFENSES HERE."); UNITED STATES V. LEMIRE, 720 F.2D 1327, 1334-35 N. 6

2    (D.C. CIR. 1983) ("THE REQUISITE ELEMENTS OF 'SCHEME TO DEFRAUD' UNDER

3    THE WIRE FRAUD STATUTE [§ 1343] AND THE MAIL FRAUD STATUTE [§ 1341], ARE

4    IDENTICAL. THUS, CASES CONSTRUING MAIL FRAUD APPLY TO THE WIRE FRAUD

5    STATUTE AS WELL."), CERT. DENIED, 467 U.S. 1226 (1984).

6    **941. 18 U.S.C. 1343—ELEMENTS OF WIRE FRAUD**

7    THE MAIL FRAUD AND WIRE FRAUD STATUTES DO NOT DEFINE THE TERMS

8    "SCHEME" OR "ARTIFICE" AND THE COURTS HAVE TRADITIONALLY BEEN

9    RELUCTANT TO OFFER DEFINITIONS OF EITHER TERM EXCEPT IN THE BROADEST

10    AND MOST GENERAL TERMS. LEMIRE, 720 F.2D AT 1335 ("CONGRESS DID NOT

11    DEFINE 'SCHEME OR ARTIFICE TO DEFRAUD' WHEN IT FIRST COINED THAT

12    PHRASE, NOR HAS IT SINCE. INSTEAD THAT EXPRESSION HAS TAKEN ON ITS

13    PRESENT MEANING FROM 111 YEARS OF CASE LAW."). THE FRAUDULENT ASPECT

14    OF THE SCHEME TO DEFRAUD IS TO BE MEASURED BY NONTECHNICAL

15    STANDARDS AND IS NOT RESTRICTED BY ANY COMMON-LAW DEFINITION OF

16    FALSE PRETENSES. "[T]HE WORDS 'TO DEFRAUD' IN THE MAIL FRAUD STATUTE

17    HAVE THE 'COMMON UNDERSTANDING' OF '"WRONGDOING ONE IN HIS

18    PROPERTY RIGHTS BY DISHONEST METHODS OR SCHEMES," AND "USUALLY

19    SIGNIFY THE DEPRIVATION OF SOMETHING OF VALUE BY TRICK, CHICANE, OR

20    OVERREACHING."'" CARPENTER, 484 U.S. AT 27 (QUOTING MCNALLY V. UNITED

21    STATES, 483 U.S. 350, 358 (1987) (QUOTING HAMMERSCHMIDT V. UNITED STATES,

22    265 U.S. 182, 188 (1924))). "THE CONCEPT OF 'FRAUD' INCLUDES THE ACT OF

23    EMBEZZLEMENT, WHICH IS '"THE FRAUDULENT APPROPRIATION TO ONE'S OWN

24    USE OF THE MONEY OR GOODS ENTRUSTED TO ONE'S OWN CARE BY

*Pro Se 1 2022*

1   ANOTHER.""" ID. (QUOTING GRIN V. SHINE, 187 U.S. 181, 189 (1902)).

2   [CITED IN JM 9-43.100]

3

4

5

6                **7-3.420 - Individual Accountability**

       Individual criminal sanctions, including prison sentences, are the single most effective

7

deterrent to antitrust offenses. The Antitrust Division therefore prioritizes holding culpable

8

executives and employees accountable, particularly high-level corporate officers responsible for

9

corporate misconduct.

10   1. protecting the integrity of our economic and capital markets by enforcing the rule of law;

11   2. protecting consumers, investors, and business entities against competitors who gain unfair

12   advantage by violating the law;

13        3. preventing violations of environmental laws; and

14        4. discouraging business practices that would permit or promote unlawful conduct at the

15   expense of the public interest.

16

17      One of the most effective ways to combat corporate misconduct is by holding

18   accountable all individuals who engage in wrongdoing. Such accountability deters future illegal

19   activity, incentivizes changes in corporate behavior, ensures that the proper parties are held

20   responsible for their actions, and promotes the public's confidence. Prosecution of a corporation

21   is not a substitute for the prosecution of criminally culpable individuals within or without the

22   corporation.  Because a corporation can act only through individuals, imposition of individual

23   criminal liability may provide the strongest deterrent against future corporate wrongdoing.

24   Provable individual criminal culpability should be pursued, particularly if it relates to high-level

*Pro Se 1 2022*

corporate officers, even in the face of an offer of a corporate guilty plea or some other disposition of the charges against the corporation, including a deferred prosecution or non-prosecution agreement, or a civil resolution. In other words, regardless of the ultimate corporate disposition, a separate evaluation must be made with respect to potentially liable individuals. Absent extraordinary circumstances or approved departmental policy such as the Antitrust Division's Corporate Leniency Policy, no corporate resolution should provide protection from criminal liability for any individuals. The United States generally should not release individuals from criminal liability based on corporate settlement releases. Any such release of individuals from criminal liability due to extraordinary circumstances must be personally approved in writing by the relevant Assistant Attorney General or United States Attorney. a corporation may be held criminally liable for the illegal acts of its directors, officers, employees, and agents. To hold a corporation liable for these actions, the government must establish that the corporate agent's actions (i) were within the scope of his duties and (ii) were intended, at least in part, to benefit the corporation. In all cases involving wrongdoing by corporate agents, prosecutors should not limit their focus solely to individuals or the corporation, but should consider both as potential targets.

Agents may act for mixed reasons—both for self-aggrandizement (direct and indirect) and for the benefit of the corporation, and a corporation may be held liable as long as one motivation of its agent is to benefit the corporation. See United States v. Potter, 463 F.3d 9, 25 (1st Cir. 2006) (stating that the test to determine whether an agent is acting within the scope of employment is "whether the agent is performing acts of the kind which he is authorized to perform, and those acts are motivated, at least in part, by an intent to benefit the corporation."). In United States v. Automated Medical Laboratories, Inc., 770 F.2d 399 (4th Cir. 1985), for

*Pro Se 1 2022*

1  example, the Fourth Circuit affirmed a corporation's conviction for the actions of a subsidiary's

2  employee despite the corporation's claim that the employee was acting for his own benefit,

3  namely his "ambitious nature and his desire to ascend the corporate ladder." Id. at 407.  The

4  court stated, "Partucci was clearly acting in part to benefit AML since his advancement within

5  the corporation depended on AML's well-being and its lack of difficulties with the FDA." Id.;

6  see also United States v. Cincotta, 689 F.2d 238, 241-42 (1st Cir. 1982) (upholding a

7  corporation's conviction, notwithstanding the substantial personal benefit reaped by its miscreant

8  agents, because the fraudulent scheme required money to pass through the corporation's treasury

9  and the fraudulently obtained goods were resold to the corporation's customers in the

10  corporation's name).

11        Moreover, the corporation need not even necessarily profit from its agent's actions for it

12  to be held liable.  In Automated Medical Laboratories, the Fourth Circuit stated: [B]enefit is not

13  a "touchstone of criminal corporate liability; benefit at best is an evidential, not an operative,

14  fact." Thus, whether the agent's actions ultimately redounded to the benefit of the corporation is

15  less significant than whether the agent acted with the intent to benefit the corporation. The basic

16  purpose of requiring that an agent have acted with the intent to benefit the corporation, however,

17  is to insulate the corporation from criminal liability for actions of its agents which may be

18  inimical to the interests of the corporation or which may have been undertaken solely to advance

19  the interests of that agent or of a party other than the corporation. 770 F.2d at 407 (internal

20  citation omitted) (quoting Old Monastery Co. v. United States, 147 F.2d 905, 908 (4th Cir.

21  1945)).

22        Private parties can also bring suits to enforce antitrust laws. Most antitrust suits are

23  brought by businesses and individuals seeking damages for the Sherman or Clayton Acts

24  violations. Private parties can also seek court orders preventing anticompetitive conduct

COMPLAINT FOR A CIVIL CASE - 38

*Pro Se 1 2022*

(injunctive relief) or bring suits under state antitrust laws. Individuals and businesses cannot sue

under the Federal Trade Commission Act. The Sherman Act outlaws "every contract,

combination, or conspiracy in restraint of trade" and any "monopolization, attempted

monopolization, or conspiracy or combination to monopolize. Certain acts are considered so

harmful to competition that they are almost always illegal. These include arrangements among

competing individuals or businesses to fix prices, divide markets, or rig bids. These acts are "per

se" violations of the Sherman Act; in other words, no defense or justification is allowed.

Although most enforcement actions are civil, the Sherman Act is also a criminal law, and the

Department of Justice may prosecute individuals and businesses that violate it. Criminal

prosecutions are typically limited to intentional and clear violations, such as when competitors

fix prices or rig bids. The Sherman Act imposes criminal penalties of up to $100 million for a

corporation and $1 million for an individual and up to 10 years in prison.

     The Federal Trade Commission Act bans "unfair methods of competition" and

"unfair or deceptive acts or practices." The Supreme Court has said that all violations of the

Sherman Act also violate the FTC Act. The Clayton Act addresses specific practices that the

Sherman Act does not clearly prohibit, such as mergers and interlocking directorates (the same

person making business decisions for competing companies). Section 7 of the Clayton Act

prohibits mergers and acquisitions where the effect "may be substantially to lessen competition,

or to tend to create a monopoly." As amended by the Robinson-Patman Act of 1936, the Clayton

Act also bans certain discriminatory prices, services, and allowances in merchant dealings. The

Clayton Act also authorizes private parties to sue for triple damages when they have been

harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order

*Pro Se 1 2022*

1 | prohibiting the anticompetitive practice in the future.

2

3 | ### 7-2.200 - The Sherman Act

4 | The Sherman Act prohibits (a) contracts, combinations, or conspiracies in restraint of interstate

5 | commerce or foreign trade (15 U.S.C. § 1), and (b) monopolization, attempts to monopolize, or

6 | combinations or conspiracies to monopolize interstate commerce or foreign trade (15 U.S.C. §

7 | 2), among other things. While a violation of this Act may be prosecuted as a felony, in general,

8 | the Department reserves criminal prosecution under Section 1 for "per se" unlawful restraints of

9 | trade among competitors, e.g., price fixing, bid rigging, and market allocation agreements.  It

10 | may also bring, and has brought, criminal charges under Section 2. Criminal violations of this

11 | Act carry a maximum prison sentence of 10 years. Criminal violations of this Act carry a

12 | maximum fine of the greatest of (a) twice the gross pecuniary gain derived from the crime, (b)

13 | twice the gross pecuniary loss caused to the victims by the crime, or (c) for defendant

14 | corporations: $100 million, and for individuals: $1,000,000.

15 | Under the Securities and Exchange Act of 1934, the SEC is the governmental

16 | agency responsible for establishing, overseeing, and enforcing laws pertaining to securities fraud.

17 | SEC Rule 10b-5, states that it is illegal for any person to defraud or deceive someone, including

18 | through the misrepresentation of material information, with respect to the sale or purchase of a

19 | security. Rule 10b-5 covers instances of insider trading, wherein an insider or executive uses

20 | nonpublic information to influence share prices to their benefit:

21 | Employment of Manipulative and Deceptive Practices. It shall be unlawful for any person,

22 | directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of

23 | the mails or of any facility of any national securities exchange,

24 | (a) To employ any device, scheme, or artifice to defraud,

*Pro Se 1 2022*

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. In sum, SEC Rule 10b-5 is applicable to any person that commits securities fraud, i.e., the intentional misrepresentation of material information in connection with securities trading, including insider trading. "Person", however, is not limited to an individual and includes businesses, corporations.

Rule 10b-5 violations include but are not limited to:

False or misleading statements made by a corporate executive intended to increase market share price False or "creative" accounting used to hide losses or insufficient revenue False or misleading statements by a corporate executive intended to decrease market share price, so that they are able to buy up those shares at the lower price.

### 15 U.S. Code § 77q - Fraudulent interstate transactions

(a) Use of interstate commerce for purpose of fraud or deceit It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c(a)(78) [1] of this title) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

*Pro Se 1 2022*

1        (3) to engage in any transaction, practice, or course of business which operates or

2    would operate as a fraud or deceit upon the purchaser.

3        (b) Use of interstate commerce for purpose of offering for sale It shall be unlawful

4    for any person, by the use of any means or instruments of transportation or communication in

5    interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any

6    notice, circular, advertisement, newspaper, article, letter, investment service, or communication

7    which, though not purporting to offer a security for sale, describes such security for a

8    consideration received or to be received, directly or indirectly, from an issuer, underwriter, or

9    dealer, without fully disclosing the receipt, whether past or prospective, of such consideration

10   and the amount thereof.

11       (c) Exemptions of section 77c not applicable to this section  The exemptions provided in

12   section 77c of this title shall not apply to the provisions of this section.

13       (d) Authority with respect to security-based swap agreements The authority of the

14   Commission under this section with respect to security-based swap agreements (as defined in

15   section 78c(a)(78) of this title) shall be subject to the restrictions and limitations of section 77b–

16   1(b) of this title.

17   (May 27, 1933, ch. 38, title I, § 17, 48 Stat. 84; Aug. 10, 1954, ch. 667, title I, § 10, 68 Stat. 686;

18   Pub. L. 106–554, § 1(a)(5) [title III, § 302(b), (c)], Dec. 21, 2000, 114 Stat. 2763, 2763A–452;

19   Pub. L. 111–203, title VII, § 762(c)(2), July 21, 2010, 124 Stat. 1759.)

20
                    **Title 18 225. Continuing financial crimes enterprise**
21
         (a) Whoever— (1) organizes, manages, or supervises a continuing financial crimes
22
     enterprise; and (2) receives $5,000,000 or more in gross receipts from such enterprise during any
23
     24-month period, shall be fined not more than $10,000,000 if an individual, or $20,000,000 if an
24
     organization, and imprisoned for a term of not less than 10 years and which may be life.

COMPLAINT FOR A CIVIL CASE - 42

*Pro Se 1 2022*

1
2
    (b) For purposes of subsection (a), the term "continuing financial crimes enterprise"

3
means a series of violations under section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344

4
of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4

5
persons acting in concert. Added Pub. L. 101–647, title XXV, §2510(a), Nov. 29, 1990, 104 Stat.

6
4863.)

7
    violations of the Sherman Act, and the Clayton Act, which prohibits anti-competitive

8
mergers, among other things. The civil RICO section says, "any person injured in his business or

9
property by reason of a violation of section 1962 ... may sue therefor in any appropriate United

10
States district court and shall recover threefold the damages he sustains and the cost of the suit,

11
including a reasonable attorney's fee Civil RICO allows litigants – victims – to sue for what are

12
essentially criminal violations. If a person uses email or telephone to Perpetrate fraud, chances

13
are they are committing wire fraud. A civil Plaintiff need only prove the criminal conduct by a

14
mere preponderance of the evidence. Prosecutors, however, must use the higher "proof beyond a

15
reasonable doubt" standard when pursuing criminal charges. Suddenly the advantage shifts to the

16
victims. The basic underpinnings of proving a RICO claim require a Plaintiff to demonstrate that,

17
the Defendants committed multiple acts of fraud, usually mail and wire fraud.  Mail and wire

18
fraud are known as predicate acts under RICO a person, an enterprise engaged in or affecting

19
interstate commerce, pattern of racketeering activity, the operation and management test, and the

20
through requirement. Although the standard of proof in a civil action is based upon the evidence,

21
Also, in a civil racketeering action alleging fraud, the claim must be pleaded with particularity.

22
By stating the circumstances constituting fraud with particularity by identifying the time, place,

23
and content of the fraudulent communications, as well as the parties to the communications. The

24
purpose of the RICO statute is "the elimination of the infiltration of organized crime and

*Pro Se 1 2022*

1   racketeering into legitimate organizations operating in interstate commerce." S.Rep. No. 617,

2   91st Cong., 1st Sess. 76 (1969).

3        Congress added a private right of action, a section that allows ordinary litigants to sue for

4   damages.

5    Congress defined "racketeering activity" to include a variety of state and federal crimes. RICO

6   is not violated by a single, short-term episode of "racketeering." Rather, there must be a

7   "pattern" of racketeering activity—meaning long-term, organized conduct. Persons convicted of

8   violating RICO's criminal provisions are subject to imprisonment and forfeiture of assets. When

9   it enacted RICO, Congress included a civil remedy provision that allows private parties to sue for

10  injuries to their "business or property" caused "by reason of" a defendant's violation of RICO.

11  Mailings or wirings sent or delivered through the use of "any private or commercial interstate

12  carrier" may violate the mail fraud statute. The object of the fraud must be property in the

13  victim's hands. As in any fraud case, a mail fraud scheme cannot be based on statements of

14  opinion.

15       Moreover, a fraud scheme cannot be based on proposed or anticipated fraudulent

16  conduct. Mail and wire fraud claims based on fraudulent omissions must establish that the

17  defendant had a duty to disclose the omitted facts. For example, the Eleventh Circuit held that a

18  pharmacy's failure to disclose pricing schedules for prescription medication was not a predicate

19  act under RICO because the pharmacy had no duty to disclose its pricing schedules to customers.

20  The mailings and wire communications need not be fraudulent in and of themselves. Innocuous

21  or "innocent" mailings and wirings are sufficient RICO predicates as long as they further a

22  fraudulent scheme. This is because the crux of mail and wire fraud is a scheme to defraud. The

23  mails or wires need only be used to carry out the scheme. Communications will not support a

24  RICO claim if they reveal sufficient facts to allow the scheme to be detected. In Bridge v.

1   Phoenix Bond & Indemnity Co., the Supreme Court held that where a RICO claim is predicated

2   on alleged mail or wire fraud, a Plaintiff need not show that it relied on the defendant's alleged

3   misrepresentations to establish the RICO claim or to establish proximate cause. Several courts

4   have held that while innocent mailings may be used to further a mail fraud scheme, and therefore

5   satisfy the elements of mail fraud, they might not establish a RICO "pattern" of "racketeering

6   activity" unless they contain misrepresentations. Even though each use of the mails may be a

7   separate indictable offense, courts are less likely to find the existence of a "pattern" if it is based

8   on a series of mailings used to further a single scheme against a single victim.Federal Rule of

9   Civil Procedure 9(b), requiring that fraud allegations be pleaded with particularity, applies to

10  civil claims under RICO where fraud is the predicate act. Thus, a Plaintiff that bases its RICO

11  claim on a mail or wire fraud scheme must allege the time, place, content of, and parties to the

12  fraudulent communications, and must show that the Plaintiff was deceived by those

13  communications. If a Plaintiff fails to plead fraudulent acts with specificity, the court might not

14  consider those acts for purposes of establishing a pattern of racketeering. When Congress

15  enacted the Reform Act in 1995, Congress did not expressly state the temporal scope of the

16  Reform Act's amendment of RICO securities fraud claims. Therefore, much of the initial case

17  law focused on whether the Reform Act applied retroactively to bar RICO claims based on

18  securities fraud that occurred before the effective date of the Act. Under the Reform Act, courts

19  have rejected securities-based RICO claims regardless of the label attached or the validity of the

20  underlying securities claim. If the defendant did not make a misrepresentation or omission in

21  connection with the sale of securities, but merely aided and abetted those who did, courts diverge

22
    on whether or not the Reform Act applies because securities fraud cannot be based on aiding and
23
    abetting. Some courts, most notably the Second and Ninth Circuits, have held that the Reform
24
    Act bars a RICO claim based on securities fraud even if the Plaintiff itself could not bring an

*Pro Se 1 2022*

1    action under the securities laws. The Seventh Circuit, however, has rejected this broad reading of

2    the Reform Act's securities fraud bar and has held that the Reform Act only bars RICO actions a

3    Plaintiff themselves could bring under the securities laws. But if the conduct does not amount to

4    securities fraud at all, the Reform Act bar does not apply. On the other hand, bank fraud can be a

5    predicate act of racketeering.

6
                         **National Stolen Property Act as a Predicate Act.**
7
     Another RICO predicate act involves the interstate transportation of stolen funds in violation of
8
     the National Stolen Property Act. A violation of § 2314 occurs when anyone "transports,
9
     transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise,
10
     securities, or money" worth more than $5,000, knowing that they have been "stolen, converted or
11
     taken by fraud." To violate § 2314, the defendant need not participate in the underlying unlawful
12
     scheme to defraud; the defendant must simply cause the transportation of the funds, goods, or
13
     securities, knowing that they were procured by fraud. The flip-side of § 2314 is § 2315, which
14
     applies to those who receive the goods or funds, knowing they were procured by fraud. If the §
15
     2314 (or § 2315) claim is based on a theory that the goods or funds were obtained through fraud,
16
     then the fraud must be pled with specificity to comply with Fed. R. Civ. P. 9(b). Interstate or
17
     Foreign Commerce A RICO claim cannot exist without some nexus to interstate commerce. A
18
     RICO enterprise is involved in "interstate commerce" when it is itself "directly engaged in the
19
     production, distribution, or acquisition of goods and services in interstate commerce." Although
20   the statutory language expressly requires that the "enterprise" must affect interstate commerce,

21   courts have ruled that the interstate commerce requirement is satisfied if the activity of either the

22   enterprise or the predicate acts of racketeering affects interstate commerce.

23
                              **PATTERN OF RACKETEERING**
24
     The RICO statute is intended to address repeat, rather than one-shot, criminal activity. For this

reason, "the heart of any RICO complaint is the allegation of a pattern of racketeering."

1. The pattern requirement is important because in providing a remedy of treble damages, "Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences."

2. For this reason, the pattern requirement acts to ensure that RICO's "Extraordinary remedy does not threaten the ordinary run of commercial transactions."

### §15. Suits by persons injured

(a) Amount of recovery; prejudgment interest Except as provided in subsection (b), any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person

promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith; (2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise

*Pro Se 1 2022*

1    providing for expeditious proceedings; and (3) whether such person or the opposing party, or

2    either party's representative, engaged in conduct primarily for the purpose of delaying the

3    litigation or increasing the cost thereof.

4    **15 U.S.C. 2 - Monopolizing trade a felony; penalty**

5    Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any

6    other person or persons, to monopolize any part of the trade or commerce among the several

7    States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof,

8    shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person,

9    $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the

10   discretion of the court.

11   (July 2, 1890, ch. 647, §2, 26 Stat. 209; July 7, 1955, ch. 281, 69 Stat. 282; Pub. L. 93–528, §3, Dec. 21, 1974, 88
     Stat. 1708; Pub. L. 101–588, §4(b), Nov. 16, 1990, 104 Stat. 2880; Pub. L. 108–237, title II, §215(b), June 22, 2004,
12   118 Stat. 668.)

13   **15 U.S.C. §3. Trusts in Territories or District of Columbia illegal; combination a felony**

14          (a) Every contract, combination in form of trust or otherwise, or conspiracy, in restraint

15   of trade or commerce in any Territory of the United States or of the District of Columbia, or in

16   restraint of trade or commerce between any such Territory and another, or between any such

17   Territory or Territories and any State or States or the District of Columbia, or with foreign

18   nations, or between the District of Columbia and any State or States or foreign nations, is

19   declared illegal. Every person who shall make any such contract or engage in any such

20   combination or conspiracy, shall be deemed guilty of a felony, and, on conviction thereof, shall

21   be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person,

22   $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in

23   the discretion of the court.

24          (b) Every person who shall monopolize, or attempt to monopolize, or combine or

COMPLAINT FOR A CIVIL CASE - 48

*Pro Se 1 2022*

conspire with any other person or persons, to monopolize any part of the trade or commerce in any Territory of the United States or of the District of Columbia, or between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia, and any State or States or foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court. (July 2, 1890, ch. 647, §3, 26 Stat. 209; July 7, 1955, ch. 281, 69 Stat. 282; Pub. L. 93–528, §3, Dec. 21, 1974, 88 Stat. 1708; Pub. L. 101–588, §4(c), Nov. 16, 1990, 104 Stat. 2880; Pub. L. 107–273, div. C, title IV, §14102(b), Nov. 2, 2002, 116 Stat. 1921; Pub. L. 108–237, title II, §215(c), June 22, 2004, 118 Stat. 668.)

## 18 U.S.C. 2  §2. Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

(June 25, 1948, ch. 645, 62 Stat. 684 ; Oct. 31, 1951, ch. 655, §17b, 65 Stat. 717 .)

The section as revised makes clear the legislative intent to punish as a principal not only one who directly commits an offense and one who "aids, abets, counsels, commands, induces or procures" another to commit an offense, but also anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States. It removes all doubt that one who puts in motion or assists in the illegal enterprise but causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed

*Pro Se 1 2022*

1   offense.

2

3                        **§2320. Trafficking in counterfeit goods or services**

4          It is illegal to "traffic" (transport, transfer, or dispose of) counterfeit items presented as

5   authentic. 18 U.S.C. § 2320 is the statute detailing the laws and penalties for trafficking in

6   counterfeit goods. The statute outlines four possible offenses under the § 2320 umbrella below.

7   Knowingly trafficking in goods or services which use a "counterfeit mark," Knowingly

8   trafficking in items to which a counterfeit mark has been applied. Types of articles included:

9   Labels, stickers, wrappers, tags, Patches, badges, Emblems, medallions, charms, Boxes, cans,

10  containers, cases, packaging, and or Documentation. Legally, a counterfeit mark defined as a

11  "spurious," or fake, mark is considered to be:Identical to, or virtually indistinguishable from,

12  another mark that is currently in use and has been registered by the U.S. Patent and Trademark

13  Office, Used similarly, or in connection with, the previously registered mark, Likely to cause

14  confusion or mistakes, Intended to deceive. Counterfeit marks frequently include logos, signs,

15  symbols, emblems, or other branding.

16         Section 2320 establishes a penalty structure for trafficking in counterfeit goods. The

17  punishments can change depending on whether the perpetrator is a person or a legal entity, such

18  as a business or corporation. The penalties for violating 18 U.S.C. § 2320 can be found within

19  the law and are pretty straightforward. Any attempt or conspiracy to violate this statute is

20  punished in the same way as a completed violation. For general violations: Once convicted,

21  trafficking in counterfeit goods carries penalty fines of up to $2,000,000 and up to 10 years of

22  Incarceration, For a second offense, fines will increase to $5,000,000, with prison time of up to

23  20 years. When legal entities committed the offense rather than an individual:If convicted, up to

24  $5,000,000 for a first-time offense, Up to $15,000,000 for subsequent offenses, In the federal

*Pro Se 1 2022*

1    courts, when a defendant has attempted or conspired to commit an offense, they are treated as if

2    they have already perpetrated the crime. Counterfeit products could be confiscated and

3    destroyed. Victims could also be awarded full restitution Under 18 U.S.C. 2323.

4

5    **Nebraska 87-302. Deceptive trade practices; enumerated**.

6    (a) A person engages in a deceptive trade practice when, in the course of his or her business,

     vocation, or occupation, he or she:(1) Passes off goods or services as those of another;(2) Causes

7    likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or

8    certification of goods or services; (3) Causes likelihood of confusion or of misunderstanding as

9    to affiliation, connection, or association with, or certification by, another; (4) Uses deceptive

10   representations or designations of geographic origin in connection with goods or services; (5)

11   Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses,

12   benefits, or quantities that they do not have or that a person has a sponsorship, approval, status,

13   affiliation, or connection that he or she does not have; (6) Represents that goods or services do

14   not have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they

15   have or that a person does not have a sponsorship, approval, status, affiliation, or connection that

16   he or she has; (7) Represents that goods are original or new if they are deteriorated, altered,

17   reconditioned, reclaimed, used, or secondhand, except that sellers may repair damage to and

18   make adjustments on or replace parts of otherwise new goods in an effort to place such goods in

19   compliance with factory specifications; (8) Represents that goods or services are of a particular

20   standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

21   (9) Disparages the goods, services, or business of another by false or misleading representation

22   of fact; (10) Advertises goods or services with intent not to sell them as advertised or  advertises

23   the price in any manner calculated or tending to mislead or in any way deceive a person; (11)

24   Advertises goods or services with intent not to supply reasonably expectable public demand,

COMPLAINT FOR A CIVIL CASE - 51

*Pro Se 1 2022*

1   unless the advertisement discloses a limitation of quantity; (12) Makes false or misleading

2   statements of fact concerning the reasons for, existence of, or amounts of price reductions;

3   (16) Uses any scheme or device to defraud by means of: (i) Obtaining money or property by

4   knowingly false or fraudulent pretenses, representations, or promises; or

5          (ii) Selling, distributing, supplying, furnishing, or procuring any property for the

6   purpose of furthering such scheme; To establish a violation of the Uniform Deceptive Trade

7   Practices Act, there must have been a representation regarding the nature of goods or services

8   and the representation must have been for characteristics or benefits that the goods or

9   services did not have. State ex rel. Stenberg v. Consumer's Choice Foods, 276 Neb. 481, 755

10  N.W.2d 583 (2008).

**Nebraska 87-303. Deceptive trade practices**

12  (a) A person likely to be damaged by a deceptive trade practice of another may bring an action

13  for, and the court may grant, an injunction under the principles of equity against the person

14  committing the deceptive trade practice. The court may order such additional equitable relief as

15  it deems necessary to protect the public from further violations, including temporary and

16  permanent injunctive relief. Proof of monetary damage, loss of profits, or intent to deceive is not

17  required. Relief granted for the copying of an article shall be limited to the prevention of

18  confusion or misunderstanding as to source.(b) Costs shall be allowed to the prevailing party

19  unless the court otherwise directs. The court in its discretion may award attorneys' fees to the

20  prevailing party if (1) the party complaining of a deceptive trade practice has brought an action

21  which he or she knew to be groundless or (2) the party charged with a deceptive trade

22  practice has willfully engaged in the trade practice knowing it to be deceptive. (c) A claim filed

23  for a violation of the Uniform Deceptive Trade Practices Act shall be proved by a preponderance

24  of the evidence.(d) The relief provided in this section is in addition to remedies otherwise

*Pro Se 1 2022*

1   available against the same conduct under the common law or other statutes of this state.(e)

2   Subdivision (a)(13) of section 87-302 shall not be construed to authorize a civil action against an

3   interactive computer service, provider of telecommunications service, or cable operator for the

4   actions of an information content provider. Unfair or deceptive acts or practices A violation of

5   subsection (a) shall be treated as a violation of a rule defining an unfair or a deceptive act or

6   practice under Based upon the declaration below, the undersigned moves the court for a

7   temporary order and order to show cause.

8   Tro prohibited injunctive relief. A temporary restraining order should be granted without written

9   or oral notice to the other party or the other party's lawyer because immediate and irreparable

10   injury, loss, or damage will result before the other party or the other party's lawyer can be heard

11   in opposition. This order should restrain or enjoin: TD AMERITRADE, INC.  TD

12   AMERITRADE, INC., WATERHOUSE SECURITIES, INC., TD WATERHOUSE INVESTOR
SERVICES, INC., TD WATERHOUSE INVESTOR SERVICES, INC.

13

14   To Restrain from canceling the plaintiff's account until MMTLP can be resolved without

     causing severe injury to the plaintiff, the account can be placed in a liquidate-only status. The

15

16   plaintiff is not asking to do new business but to conclude current business. There is a u3 halt in

     place which prevents the resolution of this security for the time being.

17

18         Reasons why This injury may be irreparable because This defendant has provided their

     intent to liquidate the Plaintiff's Account in writing. This will leave him with no way to transfer

19

20   the shares to another brokerage as it is not available for electronic transfer.

21      Reasons for a temporary order: TD AMERITRADE, INC.  TD AMERITRADE,

     INC., WATERHOUSE SECURITIES, INC., TD WATERHOUSE INVESTOR SERVICES,

22

     INC., TD WATERHOUSE INVESTOR SERVICES, INC.  allowed fraud to be committed

23

     against investors by Failing to verify the Security when allowing the sale of said security. This

24

     allowed many Investors to be the victim of Securities Fraud and stock manipulation as the

COMPLAINT FOR A CIVIL CASE - 53

*Pro Se 1 2022*

number of the Actual security was approximately 165,000,000, with 300,000,000 shares trading. This allowed them to falsely lower the value at the time that Finra (Financial Industry Regulatory Authority) noticed the issue and halted trading of $MMTLP. They let the stock be closed and deleted.  Based upon the declaration below, the undersigned moves the court for a temporary Order and order to show cause.

Tro prohibited injunctive relief A temporary restraining order should be granted without written or oral notice to the other party or the other party's lawyer because immediate and irreparable injury, loss, or damage will result before the other party or the other party's lawyer can be heard in opposition. This order should restrain or enjoin: Depositary Trust Clearing Corporation (DTCC). With regards to $MMTLP, Stop processing all transactions.

This injury may be irreparable because: as they continue to process these transactions, it allows the fraud to be hidden, and it will continue to defraud the shareholders.

Reasons for a Temporary Order Depositary Trust Clearing Corporation (DTCC) allowed fraud to be committed against investors by Failing to verify the value of securities being used as collateral when allowing short positions to be taken against this security. This allowed many Investors to be the victim of stock manipulation. The Actual security number was approximately 165,000,000, with well over  300,000,000 shares trading. This allowed them to falsely lower the value at the time that Finra (Financial Industry Regulatory Authority) noticed the issue and halted trading OF $MMTLP. They allowed the stock to be closed and deleted.

**Delaware Code Title 8. Corporations § 220**

Delaware General Corporation Law Section 220 permits a stockholder to access corporate books and records. Historically, companies generally were successful in defeating Section 220 demands because the stockholder was merely engaging in a "fishing expedition" to find evidence of wrongdoing or mismanagement; and, when a stockholder was successful in establishing

*Pro Se 1 2022*

entitlement to an inspection, The stockholder must demonstrate some "credible basis" for suspecting wrongdoing or mismanagement. In recent years, however, the courts have taken a more expansive approach to Section 220, construing it to permit access to investigate wrongdoing so long as there is any reasonable basis for suspecting it and now more frequently granting 220 Demands which the courts have imposed a relatively low bar to meet. The types of materials generally available pursuant to a Section 220 demand have also expanded—from formal board materials (meeting minutes and resolutions) to electronic records including emails, particularly when other traditional board materials are not available or do not accomplish a stockholder's proper purpose which, most commonly, is to investigate suspected corporate wrongdoing such as potential fiduciary breaches or mismanagement. The plaintiff has made particularized allegations concerning the existence of relevant communications. Moreover, the courts have reprimanded corporations that have responded to Section 220 demands with "overly aggressive" litigation strategies in seeking not to produce appropriately requested books and records. Defendants have spent far too much time and energy manipulating these clients, including attempts to enrich Their Profits and protect themselves rather than focusing their efforts on their legal obligations to their clients and or customers.

The Company's recent actions involving these securities greatly increased these concerns. As you are aware, they intentionally misled and outright lied to shareholders. This is a violation of Delaware law and a violation of the securities and exchanges laws. Specifically, preventing shareholders from transferring these securities into their own name at the transfer agent, advising clients in the way to transfer these securities in a way that would cause unjust delay allowing the securities to because trapped and allowing the purchase, sales of Counterfeit securities.

*Pro Se 1 2022*

1    The Delaware 220 law provided shareholders with the ability to adequately protect

2    themselves from corporations acting against the best interest of their shareholders this provided

3    these specific protections and didn't address the corporations that controlled the securities of

4    other corporations on behalf of the shareholders. The corporations that control these securities

5    have the same ability to injure the shareholders that the Delaware 220 law protected them from.

6    We seek to inspect the Company's books and records relating to these securities. We also seek

7    documents concerning how they engaged in selling transferring or purchasing of Fraudulent and

8    counterfeit Securities as the Company claims these were legal and we know they were obtained
     through fraud. Clearly, if this information is true, it would show that they engaged in illegal, and

9
     or prohibited activities meant to defraud investors.
10
        We also intend to investigate the Company's decision to continue to misrepresent
11
     material facts and aid the perpetrators of this fraud. The Company has publicly We wish to
12
     review whatever documentary materials or other information the Company has on this subject.
13
        We intend to examine all the information we receive and then, if appropriate, use it in
14
     either the potential Chancery Court action described above, or in some other appropriate
15
     proceeding. Finally, we are seeking the Company's stockholders materials because we believe
16
     this accounting will show that they had securities excessively beyond the number originally
17
     allowed to trade.
18

19        Pursuant to 8 Del.C. §220 Pursuant to Section 220 of the Delaware General

20   Corporation Law, Alain Hensley hereby demands the right ( its attorneys, consultants, or other

21   agents), during the usual hours of business, to inspect the following books and records of the

22   Company and to make copies or extracts therefrom.

23
     Corporate Books and Records
24
        1. All written or electronic documents or other records pertaining to the Securities he

COMPLAINT FOR A CIVIL CASE - 56

*Pro Se 1 2022*

1   purchased.

2       2. All written or electronic documents or other records relating to the information

3   provided to the board of directors – or its individual members –.

4       3. All written or electronic documents or other records relating to or evidencing

5   communication between the TD AMERITRADE, INC. TD AMERITRADE, INC.,

6   WATERHOUSE SECURITIES, INC., TD WATERHOUSE INVESTOR SERVICES, INC., TD

7   WATERHOUSE INVESTOR SERVICES, INC.and its agents or THE CHARLES SCHWAB

8   CORPORATION or Any corporation and its agents in connection with the Securities including,

9   without limitation, any and all email communications sent or received in connection therewith.

10      4. All written and electronic documents from or to any professionals, including

11  investment bankers, Market makers, Companies who Manage, sell, purchase, Transfer, or

12  Process securities transactions, proxy solicitors, or anyone who Participated, assisted or advised

13  the Company in the securities.

14      5. All written or electronic documents or other records pertaining to MetaMeterials inc.

15  Series A preferred shares, and all information concerning the relationship between TD

16  AMERITRADE, INC.  TD AMERITRADE, INC., WATERHOUSE SECURITIES, INC., TD

17  WATERHOUSE INVESTOR SERVICES, INC., TD WATERHOUSE INVESTOR SERVICES,

18  INC., THE CHARLES SCHWAB CORPORATION and/or any of its officers and employees, on

19  one hand, and the Company and and/or any of its officers and employees, on the other hand.

20      6. All written or electronic documents or other records provided to or generated by the

21  board or any committee thereof concerning These Securities.

22      7. The most recent complete record or list of the stockholders of record of the Securities,

23  certified by its transfer agent, showing the name and address of each stockholder and the number

24  of shares of stock registered in the name of each stockholder.

*Pro Se 1 2022*

1       8.  All information in the Company's possession or control, or which can reasonably be

2  obtained from nominees of any central Stock, Securities, and certificate depository system, or

3  from banks, Transfer Agents brokers or dealers, concerning the number and identity of the actual

4  beneficial owners of the Company's stock including, but not limited to, all "CEDE breakdowns"

5  omnibus proxies from such entities.

6       9.  All information in, or which comes into, the possession or control of the Company, or

7  which can reasonably be obtained from brokers, dealers, banks, clearing agencies, Finra,

8  securities and exchanges commission, voting trustees or other nominees concerning these

9  Securities.

10  For damages according to proof.

11  For General Damages in an amount to be determined by proof at trial.

12  For punitive damages where applicable.

13  For reasonable court and filing fees.

14  For any prejudgment or other interest according to law; and

15  For such other and further relief that the Court deems just and proper.

16  For All documentation and or records regrading MMTLP, NBH, TRCH and MMAT Securities.

17  The Defendant Defendants be ordered to turn over all Memo's, Internal emails, External emails

18  to or from the DTCC and subsidiaries, FINRA, AST, SEC, and any other Companies or

19  organizations. All Recordings and documentation from my Account held with the defendant.

20

21                    **Scope of Documents Requested:**

22  Section 220(b) permits a stockholder, upon stating a proper purpose under oath, to inspect: (1)

23  the corporation's stock ledger, (2) its list of stockholders, and (3) "other books and records" of

24  the corporation.

COMPLAINT FOR A CIVIL CASE - 58

*Pro Se 1 2022*

1         Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my

2    knowledge, information, and belief that this complaint: (1) is not being presented for an improper

3    purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

4    (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or

5    reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so

6    identified, will likely have evidentiary support after a reasonable opportunity for further

7    investigation or discovery; and (4) the complaint otherwise complies with the requirements of

8    Rule 11.

9         I agree to provide the Clerk's Office with any changes to my address where case-related

10   papers may be served. I understand that my failure to keep a current address on file with the

11   Clerk's Office may result in the dismissal of my case.

12        Date of signing:     2-28-23

13        Signature of Plaintiff   *Alain Hensley*

14        Printed Name of Plaintiff  *Alain Hensley*

15

16        Date of signing:

17        Signature of Plaintiff

18        Printed Name of Plaintiff

19

20

21

22

23

24

COMPLAINT FOR A CIVIL CASE - 59